SHOOK V. STATE

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-06-187-CR

HENRY DARREN SHOOK APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 158TH DISTRICT COURT OF DENTON COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------ 

I.  Introduction

Appellant Henry Darren Shook appeals his conviction, ten-year probated sentence, and $10,000 fine for indecency with a child.  In four issues, appellant complains that the trial court erred by not reading the indictment to the jury and by declaring a mistrial when the jury was unable to reach a unanimous verdict on the second count and that the evidence is legally and factually insufficient to support the jury’s verdict on the first count.  We affirm.

II.  Background Facts

K.A., a thirteen-year-old girl, lived in Oklahoma with her mother, Kathy A., her stepfather, and her younger sister, J.A.  K.A. and J.A. usually spent time during holidays and summers with their aunt, Lena Morris-Shook, and their uncle, appellant, in Flower Mound, Texas.

In December 2002, while K.A.’s family visited the Shooks for the holidays, appellant lay on the couch with K.A. and then allegedly rubbed her leg and moved his hand towards her inner thigh.  The next month, Kathy noticed that K.A.’s behavior changed.  K.A. withdrew from her friends, she did not want to participate in cheerleading or most sports, and her grades worsened.  K.A. also began to avoid the Shooks at family gatherings.

In July 2003, K.A. and J.A. spent a week with the Shooks.  One night during this visit, appellant allegedly watched a pornographic video while he was alone with the girls.  Appellant allegedly put his fingers in K.A.’s mouth, got under a blanket with her, kissed her, lifted up her shirt, and licked and sucked on her breast.  Appellant also allegedly pulled K.A.’s panties down and penetrated her vagina with his fingers.  That same night, K.A. thought she heard a dog entering her room; instead, appellant allegedly crawled into the room on his hands and knees and tried to kiss her. 

During the same week that summer, K.A. and J.A. went camping with the Shooks.  K.A. swam out too far in the lake, and appellant had to swim out to get her.  When K.A. climbed on his back, appellant allegedly slipped his fingers underneath her swimsuit and touched her genitals.  Later that night in the Shook’s camper, appellant allegedly grabbed K.A.’s hand, put it down his pants, and tried to make her “give him a hand job.”  Appellant also allegedly slid his hand down K.A.’s pants and touched her genitals.

In spring 2004, K.A. told Kathy about the abuse, and Kathy reported it to the police that summer.  Consequently, appellant was charged with one count of indecency with a child and with one count of sexual assault of a child.  The jury found him guilty of indecency with a child but was not able to reach a unanimous verdict on the sexual assault of a child count.  The trial court granted a mistrial on that count but entered a judgment on the indecency with a child count, fined appellant $10,000, and sentenced him to ten years’ imprisonment, probated for five years.  This appeal followed.

III.  The Trial Court’s Failure to Read the Indictment

In his first issue, appellant claims that the trial court erred by failing to read the indictment to the jury before he pled not guilty.  Section 36.01(a)(1)-(2) of the code of criminal procedure requires that the indictment be read to the jury before the defendant enters his plea.  
See
 
Tex. Code Crim. Proc. Ann.
 art. 36.01(a)(1), (2) (Vernon 2007).  This provision is mandatory.  
See Warren v. State
, 693 S.W.2d 414, 415 (Tex. Crim. App. 1985).  The rationale behind this provision is that until the charging instrument is read to the accused and he pleads to it, no issue is joined upon which to try him.  
Ex parte Sewell
, 742 S.W.2d 393, 395 (Tex. Crim. App. 1987) (op. on reh’g).  

Error that results from not reading the indictment and not entering a plea can be cured at trial if raised by a party.  
See Warren
, 693 S.W.2d at 416.  But when the error is discovered after trial, the error is preserved by means of a motion for new trial, bill of exception, or motion to arrest judgment.  
See id
.

We agree with the State that appellant failed to object at trial to the trial court’s alleged failure to read the indictment and failed to raise this issue in his motion for new trial.  
To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P.
 33.1(a)(1); 
Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied, 
526 U.S. 1070 (1999).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court’s refusal to rule.  
Tex. R. App. P.
 33.1(a)(2); 
Mendez v. State
, 138 S.W.3d 334, 341 (Tex. Crim. App. 2004).  

By failing to alert the trial court to his complaint, appellant has waived this issue on appeal.  
See Cantu v. State
, 939 S.W.2d 627, 646 (Tex. Crim. App. 1996) 
(appellant waived error by failing to object when trial judge did not read indictment to jury), 
cert. denied
, 522 U.S. 994 (1997)
. 
 
Accordingly, we overrule appellant’s first issue.  

IV.  Sufficiency of the Evidence

In his second and third issues, appellant contends that the evidence is legally and factually insufficient to support the jury’s verdict that he engaged in sexual contact with K.A. (Count I).  
A person commits indecency with a child if, with a child younger than seventeen and not the person’s spouse, the person engages in sexual contact with the child, or with intent to arouse or gratify the sexual desire of any person, exposes any part of the person’s genitals, knowing the child is present.  
Tex. Penal Code Ann.
 § 21.11(a)(1), (2)(A) (Vernon 2003)
.  
“Sexual contact” means any touching by a person of a child’s genitals, including through clothing, with the intent to arouse or gratify the sexual desire of any person. 
 Id
.
 
§
 21.11(c)
; see Santos v. State
, 961 S.W.2d 304, 308 (Tex. App.—Houston [1st Dist.] 1997, pet. ref’d).

A.  Standards of Review

1.  Legal Sufficiency

In reviewing the legal sufficiency of the evidence to support a conviction, we view all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Hampton v. State
, 165 S.W.3d 691, 693 (Tex. Crim. App. 2005).

2.  Factual Sufficiency

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party.  
Watson v. State
, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); 
Drichas v. State
, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the fact-finder’s determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the fact-finder’s determination is manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417; 
Johnson v. State
, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000). 

B.  Analysis
 

In December 2002, K.A. was thirteen years old and lived in Kingfisher, Oklahoma.  She was an outgoing girl who participated in basketball, softball, track, 4-H, and cheerleading.   

In 2002, K.A.’s family spent Christmas Eve at the Shooks
’ home and Christmas Day at K.A.’s grandfather’s home.  K.A. testified that on Christmas Eve, she and J.A. were in the Shooks’ living room watching movies while the other family members cooked dinner.  At some point, appellant came into the living room, lay down on the couch with his back to K.A., reached back, rubbed K.A.’s leg, and moved his hand towards her inner thigh.  Kathy testified that when K.A. later told her about the inappropriate touching on Christmas Eve, K.A. had said that appellant actually touched her breast and put his hand between her legs.
  K.A.’
s aunt, Lena, testified that she had seen appellant and K.A. lie on the couch together before and that it made her feel “weird.”  Appellant denied touching K.A. while on the couch but stated, “I’m sure we probably were on the sofa at the same time at any given point.”  

Kathy testified that she first began to see a change in K.A.’s behavior that next month.  Specifically, K.A. did not get along with people as well as she had before, she withdrew from friends and became a generally withdrawn person, and she no longer wanted to participate in cheerleading or most sports.  K.A.’s grades fell from “As” and “Bs” to “Bs” and “Cs.”  In the past, K.A. would normally spend a lot of time with the Shooks, but she began to avoid them at family gatherings.

In July 2003, K.A. and J.A. spent approximately one week with the Shooks.  K.A. testified that she stayed at the Shooks’
 home and then the group had gone camping a few days later, but Lena and appellant testified that they had gone camping first and then stayed at their home in Flower Mound.  While in appellant’s living room one night, K.A. was on the floor near the fireplace, and appellant was in a chair near K.A.; Lena had gone to bed early.  K.A. testified that while appellant watched a video of “graphically nude people,” 
he dropped his hand near K.A. and put his fingers in her mouth. 

K.A. testified that after she spit out appellant’s fingers, appellant got a blanket, lay on the floor next to her, and covered them both up.  Appellant tried to kiss K.A. on the mouth, and he lifted up her shirt and licked and sucked on her breast.  K.A. testified that appellant slowly pulled her panties down and then “his head and everything disappeared.”  K.A. believed that appellant had penetrated her vagina with his fingers, and she felt appellant’s facial hair against the side of her legs.  Appellant suddenly got up and went to the bathroom, and K.A. got dressed and went upstairs to a spare bedroom to go to sleep.

That same night, K.A. thought she heard a dog coming into the bedroom, but when she looked, she saw appellant crawling into the room on his hands and knees.  Appellant crawled beside the bed and tried to kiss K.A., but she told him that she was tired and to go away. 

The following day, K.A. told a neighbor that appellant had entered her bedroom the night before.  She did not tell the neighbor any other details because other children came into the room.  The neighbor told Lena what K.A. had said, and that night, Lena asked K.A. about the incident.  However, K.A. did not tell Lena about the inappropriate touching because appellant was watching the conversation, and she felt intimidated by his stare.

Later that night, Lena confronted appellant about entering K.A.’s bedroom.  Appellant told Lena that he had heard something and went to check on K.A.  Lena had a “gut feeling” and told appellant to wake her up in the future if he heard something from the girls. 

Although K.A. testified that she and J.A. told Lena about appellant watching porn in front of them, Lena denied the conversation.  However, both Lena and appellant admitted that appellant kept porn in their house.  Although appellant stated that the videos were kept in their bedroom, Lena stated that they kept the videos in the living room and that one was usually in the VCR player. 

During that same week in July 2003, K.A. and J.A. went camping with the Shooks.  Once, K.A. swam too far out in the lake, and appellant went out to get her.  K.A. climbed on appellant’s back, and she thought he was putting his arms around her legs to hold her; instead, he slipped his fingers underneath her swimsuit and touched her genitals. 

Inside the Shooks
’ camper that same night, appellant dropped his arm onto K.A.’s bed and “began to feel around.”
(footnote: 2)  K.A. testified that appellant took her hand, put it down his pants, and tried to make her “give him a hand job.” Appellant also slid his hand down K.A.’s pants and tried to put his fingers inside of her vagina, but she rolled over.  However, K.A. testified that appellant’s fingers penetrated her vagina once or twice that night.  Appellant testified that he never touched K.A., that the beds were on opposite ends of the camper, and that the camper would rock and the dogs would wake up if there was any movement.  Lena testified that, at some point, appellant became more interested in visiting K.A. and J.A. in Oklahoma than he had in the past. 

During Easter of 2004, K.A. went to visit her cousin Alexandria in Denton, Texas.  While watching a horror movie with Alexandria and Alexandria’s boyfriend, K.A. went into the bathroom.  Alexandria, worried that K.A. had been gone for a while, followed her in there and saw that K.A. was crying. Alexandria, surprised because K.A. was usually “strong-willed” and “happy-go-lucky,” asked K.A. what was wrong.  Initially K.A. was reluctant to tell Alexandria what was bothering her, but after Alexandria continued to question her, K.A. told Alexandria that appellant had sexually molested her.  Specifically, K.A. told Alexandria about appellant’s
 entering her bedroom and touching her in the camper.  She also told Alexandria that appellant had placed his hands into her “vagina area.”  Alexandria testified that K.A. was crying hysterically throughout the conversation, and because she was so upset, Alexandria did not press for more details.

At some point in March 2004, Kathy told K.A. that appellant and Lena were getting a divorce, and she was surprised at how passive K.A. was to the news.  That same night, K.A. told Kathy that appellant had inappropriately touched her.
(footnote: 3)  K.A. only told Kathy about the Christmas Eve 2002 incident; Kathy did not find out about the July 2003 abuse until after K.A. had spoke with a counselor.  Shortly after Kathy reported the abuse to the authorities in July 2004, K.A. went to speak with a counselor at the Northwest Behavioral Center in Kingfisher, Oklahoma.  K.A. told the counselor that during the camping trip, appellant touched her and tried to make her hold his penis.

Appellant points out that some of K.A.’s testimony conflicted with statements made by other witnesses.  Appellant also notes that K.A. told different versions of her story to several different people, including Kathy and Alexandria.  Appellant also denies ever touching K.A. in an inappropriate manner. However, K.A. consistently stated that appellant inappropriately touched her while at the campsite and at his house in July 2003.  Further, K.A. became more withdrawn, less interested in sports and cheerleading, and performed worse in school immediately after the first abuse in December 2002.  

Equally important, it is up to the fact finder to reconcile contradictory testimonial evidence because resolution of the conflict “often turns on an evaluation of the credibility and demeanor, and [the] jurors were in attendance when the testimony was delivered.”  
Johnson
, 23 S.W.3d at 8.  After reviewing the evidence in a light most favorable to the verdict, we conclude that any rational juror could have found the essential elements of indecency with a child beyond a reasonable doubt.  
See
 
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789; 
Hampton
, 165 S.W.3d at 693.  Further, the evidence supporting the conviction is not so weak, nor the contrary evidence so overwhelming, that the jury’s verdict is clearly wrong or manifestly unjust.  
Watson
, 204 S.W.3d at 414-15, 417.  Therefore, we hold that the evidence is both legally and factually sufficient to support the jury’s finding.
  
Accordingly, we overrule appellant’s second and third issues.
  

V.  The Sua Sponte Mistrial

In his fourth issue, appellant asserts that the trial court erred in declaring a mistrial on the aggravated sexual assault count when the jury was unable to reach a verdict on that count.  In reviewing a trial court’s ruling on a motion for mistrial, we apply an abuse of discretion standard of review and will uphold the ruling if it was within the zone of reasonable disagreement.  
See Wead v. State
, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004).
 
 

A court may discharge a jury under circumstances “where [the jury] has been kept together for such time as to render it improbable that they can agree.” 
Tex. Code Crim. Proc. Ann. 
art. 36.31.  The length of the deliberation required is left to the discretion of the trial court. 
 DeLuna v. State
, 711 S.W.2d 44, 48 (Tex. Crim. App. 1986);
 Husain v. State
, 161 S.W.3d 642, 645 (Tex. App.—San Antonio 2005, pet. ref’d).  In evaluating the propriety of a mistrial, the length of time spent in deliberations as well as the specific circumstances of the case should be examined. 
 Patterson v. State
, 598 S.W.2d 265, 268 (Tex. Crim. App. [Panel Op.] 1980).
  
However, a trial court must consider and rule out less drastic measures before declaring a mistrial.  
Brown v. State
, 907 S.W.2d 835, 839 (Tex. Crim. App. 1995).  If a trial court declares a mistrial despite available less drastic measures, there is no manifest necessity and we will find an abuse of discretion. 
 Id.
 

After four hours of testimony and almost seven hours of deliberations, the jury returned a verdict of guilty on the indecency count but remained deadlocked on the aggravated sexual assault count.  The jury requested a recess until the next morning because one juror had a child at home with no supervision.  Appellant refused to agree to the overnight recess and instead argued that deliberations should continue into the night.  The following discussion then ensued:

THE COURT: It is now 8:30. The jury sent this last note out at 8:00 p.m. They began deliberation at 1:00.  That’s almost seven hours of continuous deliberation, take away 45 minutes or an hour when we were trying to discover what to do on one of their other notes.  They have deliberated in excess of six hours.  The total testimony took no more than perhaps four hours.

. . . .

THE COURT: The last note says, “we the jury, are unable to come to an [agreement] on the second charge.  Can we recess until the morning to give the matter further thought?  Extenuating circumstances of having a child at home alone have been brought to our attention.” That’s signed by Dandra E. Smith, I believe.

THE BAILIFF: That’s the foreman.

THE COURT: It is my opinion that under the circumstances, causing this particular jury to be sequestered will not lead to justice. If there is someone on that jury that has a child alone at home, I do not believe that sequestering them—that juror being unable to take care of a child at home will cause undue pressure and influence on the jury—on that particular juror.

[THE STATE]: Your Honor if I may?

THE COURT: Please.

[THE STATE]: Would it be possible—I understand [Defense Counsel] does not want the jury to separate and he wants them to continue to deliberate tonight. Would it be possible— 

THE COURT: Deliberation is about over. There will be no more deliberation tonight. They have deliberated long enough.  I do not believe in holding people in a little room until somebody cracks and makes a decision one way or the other.

[THE STATE]: I guess my only suggestion would be since only one juror–

. . .  Can we go off the record?

THE COURT: No.

[THE STATE]: Since one juror has indicated they have a child at home, could we at least recess and give this person an opportunity to find out whether or not they can make other arrangements before we go any further?  It—maybe it’s a simple matter of they have been deliberating in the jury room and have not have an opportunity to call family members or friends and make arrangements for this child.

THE COURT: Can the State give me any legal reason I cannot declare a mistrial because of a hung jury under these circumstances?

[THE STATE]: No. If that is your decision as a judge in the best interest of justice, that’s your call.  You know the legal test, and the State certainly sees Your Honor’s point and knows that you in communicating with your bailiff have seen the jury during the breaks and things like that, so I respect your opinion, Your Honor.

THE COURT: Bring the jury back in.

Following this discussion, the trial court accepted the verdict on the indecency with a child count and declared a mistrial on the aggravated sexual assault count, and appellant objected.

Other alternative measures were examined by the court; however, appellant rejected the trial court’s suggestion to dismiss the jurors for the night.
(footnote: 4)  Further, the trial court felt that sequestering the jury for the night would not lead to justice because it would cause undue pressure and influence on the juror whose child was home alone.  Thus, the trial court was left with the least drastic option available.  
See Wead
, 129 S.W.3d at 129.  

Appellant also argues that the trial court violated article 37.07 of the code of criminal procedure by allowing the jury to return a “partial verdict” when it could not reach a unanimous decision on Count II. 
 Tex. Code Crim. Proc. Ann.
 art. 37.07, § 1(c) (Vernon 2006).  
We disagree.  Although the jury did not reach a unanimous verdict on Count II, it did reach a unanimous verdict on Count I, and the trial court appropriately entered a general verdict on Count I.  Further, the trial court had discretion to grant a mistrial on Count II and discharge the jury when it discovered that a juror had to return home to care for her child.  
See Husain
, 161 S.W.3d at 647 (affirming the trial court’s acceptance of a guilty verdict on one count and the declaration of a mistrial on a second count where the jury deliberated for sixteen hours in a trial that lasted two and one-half days).

Because the trial court did not abuse its discretion by declaring a mistrial, we overrule appellant’s fourth issue.

VI.  Conclusion

Having overruled appellant’s four issues, we affirm the trial court’s judgment.  

TERRIE LIVINGSTON

JUSTICE

PANEL F: LIVINGSTON, WALKER, and MCCOY, JJ.

DO NOT PUBLISH

Tex. R. App. P.
 47.2(b)

DELIVERED: June 21, 2007

FOOTNOTES
1:
See
 
Tex. R. App. P.
 47.4.

2:
K.A.’s bed was located next to appellant and Lena’s bed, but was a little lower to the ground. 

3:
Kathy and her husband chose not to report the incident until July 2004  so that K.A. would not get involved in the divorce proceedings.

4:
See
 
Tex. Code Crim. Proc. Ann.
 art. 35.23 (Vernon 2006) (providing that a trial court may, on its own motion or on the motion of either party, after the charge has been given, order that the jury not be allowed to separate).